The bill in this case, therefore, will be dismissed.

CORNELIUS McLEAN for Complainants.
A. RANDALL and JAMES MURRAY for Defendants.

[This decree was affirmed on appeal.]

RICHARD W. GILL, TRUSTEE, ET AL.
vs.
WILLIAM B. McATTEE ET AL.
} JULY TERM, 1851.

[EQUITABLE LIEN ON LANDS—SECRET EQUITIES—SPECIFIC PERFORMANCE OF CONTRACT FOR MORTGAGE.]

S., A TRUSTEE under a decree of the Court of Chancery, to invest certain trust moneys, agreed with D., the surety in his trustee's bond, to lend him $12,000 of the trust funds, to be secured by a mortgage upon D's lands; and some time in the year 1845 advanced $6000, part of the said $12,000, to D., and agreed to apply the other $6000 to the payment of a judgment against D. Afterwards, in the same year, D. executed a mortgage upon the lands now held by the defendant, to secure the payment of the said $12,000. S. failed to pay the judgment, and the mortgage was never recorded nor reported to the Chancellor for his approval; but was, subsequently, about the 1st of January, 1846, returned by S. to D., and by him destroyed. S. at or before this time, had received large sums of the trust money, which he failed to invest, and was subsequently removed from his office, and a new trustee appointed in his place. The lands were sold at sheriff's sale, and purchased by the defendant for $500, subject to prior judgment liens amounting to nearly their full value. The complainants, the *cestui que trusts* of the fund, then filed their bill, claiming an equitable lien upon these lands in the hands of the purchaser, by reason of the above agreement between S. and D. HELD—

That it is very clear the complainants cannot have relief, unless they can show themselves entitled to an equitable lien upon these lands, which, upon principles of equity, they may set up and maintain against the purchaser; and, that to do this, they must make out, by satisfactory proofs, a certain, distinct and *consummated* contract between S. and D., for such a lien.

The circumstances of this case, coupled with the fact of the actual surrender to, and cancellation of, the mortgage by the mortgagor, fail to show such a consummate and binding agreement for a mortgage, as a court of equity would enforce, as against creditors and purchasers.

Courts of equity have properly required, that every agreement shall be clearly and explicitly established before they will lend their aid to enforce it.

The doctrine of postponing registered to unregistered conveyances, upon the ground of notice, has been so qualified as only to apply to cases where the notice is so clearly proved as to make it fraudulent in one purchaser to take and register a conveyance in prejudice to the known title of the other.

This qualification would seem to inculcate the doctrine, that the courts should be cautious how they give expansion to the cases in which secret equitable contracts for liens have been set up as against innocent third parties.

The cases in which these secret equities have been set up, were all cases between the party holding the lien and creditors; and, it is believed, no case can be found in which such secret equitable lien has been maintained against a purchaser; and to enforce the agreement in this case would be pushing the case of Alexander vs. Ghiselen further than is warranted by any principle clearly decided in it.

As far as the cases have gone in Maryland, it is proper for the security of the rights of property, and to avoid confusion and uncertainty, that the courts should continue to enforce these equitable contracts for mortgages, when clearly proved, as against creditors; but the policy of carrying the doctrine further than it has already been pressed, is doubted.

——

[The object of the bill in this cause is to obtain as pecific execution of a contract for a mortgage, made between John R. Dall, of Washington county, and William Schley, of the city of Baltimore, acting as trustee under the will of the late John McKim, Jr., and the appointment of the Chancellor, for the use of Eliza McKim Duncan, and Ann McKim Handy, married women, in relation to the lands and real estate of the said John R. Dall, for the sum of $12,000, and to remove the incumbrance of certain judgments at law, both prior and subsequent to such contract; and also to declare, that a mortgage of the said Dall to a certain Gerard Stonebraker, not recorded in season, should be postponed to the said contract of mortgage.

The bill alleges the rights of the female complainants, under the will of their father: the appointment of the said William Schley as the trustee: the fact that said Dall was the security of the said Schley for the due performance of his trust: the receipt by said Schley of large sums of money, as trustee, from

the Court of Chancery, during the year 1845, to be invested : his failure to invest the same, his being required to account for his trust, his default therein, the revocation of his power, and the appointment of Gill, the complainant, as his successor. It states, also, that either before he received the trust funds, or while he had them, he contracted with the said John R. Dall, to loan him $12,000, to be secured on his lands in Washington county : that in pursuance of such contract, Dall executed such mortgage, and sent the same to Schley for his inspection, and the inspection of the said female complainants, to whom it was submitted and approved of, and then returned to said Schley, to be put on record. That Schley, without the knowledge of his *cestui que trusts*, returned it again to Dall; that the same was not put upon record, and is either in the possession of Dall or Schley, or has been destroyed. The bill further states that Schley paid Dall $6,000, and that Dall appointed him his agent, or made arrangements with him, unknown to complainants, as to how the other $6,000 should be paid, well knowing that Schley had the funds to pay them in hand, and is therefore estopped from controverting the application of the funds by Schley, as respects the $6,000 last mentioned. The bill also alleges an alternative equity on the ground of part performance of the contract, if not in writing, by the payment of $6,000 to said Dall, by said Schley, as trustee : and it also alleges, that by the ignorance of the *cestui que trusts* of the fact, that the mortgage was not put upon record, and by their belief that said Schley had duly and properly invested the sum of $12,000, they were lulled into a false confidence in the due execution of his duty, and so permitted the said Schley to receive other large sums of money, which they could and would have prevented had they known of his default in the premises.

The bill also alleges that a variety of judgments had been obtained against said Dall, of which the complainants pray an account may be taken ; that some were confessed prior to their lien, others since ; that certain of said judgments were void under the insolvent laws of Maryland ; that said Dall and Schley are both insolvent debtors. It also further states that

23*

the lands of the said Dall, upon which the complainants claim their lien, as above stated, were, on the 11th of November, 1847, sold by the sheriff of Washington county, by virtue of writs of *fieri facias*, issued out of the County Court of said county, upon judgments of the Hagerstown Bank, and Jacob Towson's executor, against said Dall, subject to all prior claims and judgments, to the defendant, Wm. B. McAttee, and that said lands in the hands of said McAttee remain and are subject to the lien, mortgage and claim of the complainants in equity. The bill also alleges that a mortgage from said Dall to a certain Gerard Stonebraker, for the use of Elizabeth Stonebraker, his wife, was not recorded in due time, and cannot prevail against the lien of the complainants.

The answer of McAttee, (the only one alluded to in the opinion of the Chancellor,) states that respondent having informed himself of the amount of liens, of record in Washington County Court, upon the land of said Dall, attended the sale thereof by the sheriff, and purchased Dall's interest therein for $500, and then proceeds as follows : "And this defendant avers that he knows nothing of the mortgage charged in complainant's bill, to have been executed by the said Dall to the said Schley, out of which the pretended equities of the complainants are supposed to exist. That he had seen from the record office of Washington county, a list of all liens, having any legal force on said lands, before he purchased the same, and he insists that he is a purchaser without notice of any lien, other than those duly of record, and can neither admit, or deny the charges in complainant's bill, in that behalf. That about the time of said sale, this defendant learned that John R. Dall was the surety of William Schley, and was likely to have to answer for many of his debts. That this defendant knew nothing of his business in the year 1846, and denies all, and all manner of, fraud as charged in the bill of complaint, and insists that the sale made to him is valid, and as such purchaser, he is advised, his lands, conveyed by the said sheriff, cannot be properly chargeable with any incumbrance, other than those legally obtained, and recorded as required by law, and prays to be dismissed," &c.

An agreement of facts, and submitting the questions to be decided, was filed on the 22d of July, 1851. All of which is fully stated in the opinion.]

THE CHANCELLOR:

I do not deem it necessary to express an opinion upon many of the questions which have been so fully and well argued at the bar by counsel, because in the view I have taken of the case, there is one objection to the title of the complainants to relief, which is altogether insuperable.

The question submitted by the agreement filed on the 22d inst., is, whether the alleged equitable lien of the complainants on the lands of the late John R. Dall can be maintained as against the defendant, McAttee, the purchaser of those lands? and for the purpose of raising that question, several facts have been agreed upon by the parties, and reference made to certain papers filed in the cause, which are to be taken as evidence, and have effect according to their true import and operation.

By the agreement it appears, that Mr. William Schley was, on the 13th of January, 1845, appointed by the decree of this court, trustee to receive and invest under its directions, the funds arising under the will of the late John McKim, jr., and that John R. Dall was surety in his bond as trustee. That on or after the period of his appointment, and prior to the date of the judgments under which the defendant, McAttee, purchased, Schley, as trustee, had received large amounts of the trust money, as specified in the complainant's bill, and that subsequently thereto, and prior to the date of said judgments, Schley agreed with Dall, to lend him $12,000, part of said trust fund, and did some time in the year 1845, advance the sum of $6,000, part of said sum of $12,000, and agreed with Dall to apply the other $6,000 to the payment of the judgment of one Jacob Albert, against said Dall, or as may be shown by the correspondence between Dall and Schley, filed in the cause, and which it was agreed should be considered as if regularly proved under a commission, and that Dall, some time in the year 1845, executed a mortgage to Schley, upon the lands now

claimed by McAttee, to secure the payment of the aforesaid sum of $12,000, which mortgage never was recorded, or reported to the Chancellor for his approval, but w as subsequently, on or about the 1st of January, 1846, returned by said Schley to Dall, and by him destroyed.

It was also agreed, that a schedule of judgments against Dall, prior to those under which the defendant McAttee purchased, filed as exhibit No. 1, should be received as evidence, by which it appeared that the incumbrances subject to which the purchase was made, amounted to nearly sixty thousand dollars, being about the value of the lands, as appraised by the sheriff's appraisers on the 7th of September, 1847, the sale being made by the sheriff on the 11th of November of that year, for $500, subject to those incumbrances.

The agreement further stipulated, that for the purpose of presenting the question, whether the alleged equitable lien of the complainants could be enforced against McAttee, the purchaser, the matters of fact set forth in the answer of the latter, should be considered as if regularly proved, and that a paper filed and marked exhibit No. 2, should also be considered, as if proved under a commission. This paper, which is the sheriff's return to the writs of *fieri facias*, under which McAttee purchased the lands, shows the payment of the purchase money by him, and by the certificate of the crier appended to the return, it appears, that the property sold for the sum of $500, subject to all prior claims and judgments, and that McAttee, who was present in person at the sale, heard the crier give notice that the property would be sold, subject as aforesaid.

It was also agreed, that the answer of McAttee presents the question, whether he, as a *bona fide* purchaser, without notice of the alleged equitable lien of the complainants, would be bound by said lien, and if so considered, the Chancellor should be of opinion, that the said McAttee would be relieved from responsibility to the complainants, and should be further of opinion, that his answer does not present the case of a *bona fide* purchaser without notice, then, the said answer may be amended, if, in the opinion of the Chancellor, the said McAttee, prior

to the agreement, would, under the rules of the court, have been entitled to leave to amend.

The parties further agreed, that the admission on the part of the complainant, in reference to the answer of McAttee, and the admission on the part of the defendant, in regard to exhibit No. 2, and the certificate of the crier thereto attached, should not preclude the complainants from contending before the Chancellor, that said exhibit and certificate is evidence of notice to the defendant, of their alleged equitable claim; nor, on the other hand, deprive the defendant McAttee, of the right of insisting that they do not give him such notice. It was also agreed that the *cestui que trusts* in this case are married women, and that the complainant Gill was duly appointed and qualified as trustee, by giving bond, as alleged in the bill, and that the authority of Schley as trustee was revoked, as in the bill is likewise stated.

A portion of the argument has turned upon the frame of the answer of McAttee, it being insisted upon the one side, that it does, and upon the other that it does not, place him in the attitude and clothe him with the rights of a *bona fide* purchaser without notice, and, perhaps, in view of the authorities which have been referred to, and especially of what was said by the Court of Appeals in *Baynard* vs. *Norris et al.* 5 *Gill*, 481, 482, it would be difficult to support this answer, as presenting that defence in the form in which it must appear to be available.

It may be, however, that the agreement in this case removes the objection to the form of the answer, it being therein stipulated, that the answer *presents the question*, whether he, (McAttee,) as a *bona fide* purchaser without notice of the alleged equitable lien of the complainants, is bound by said lien, or whether the land so purchased by him, would be subject to said lien—the qualification in the subsequent part of the agreement having reference rather to the question, whether the exhibit No. 2 and the certificate attached to it furnish *evidence* of notice in fact or not, than to the question, whether the answer itself, consistently with the rules of equity pleading, places the defendant in an attitude to rely upon that defence.

I do not, however, propose to lay any stress upon this view of the agreement, because in another part of it, the question is submitted, whether the answer does present the case of a *bona fide* purchaser without notice.

One thing is very clear, that the complainants cannot have a decree, unless they can show themselves entitled to an equitable lien upon the lands purchased by the defendant at the sheriff's sale, and which, upon principles of equity, they may set up and maintain against him, and in order to this, they must make out by satisfactory proofs, a certain, distinct and consummated contract between Schley and Dall for such a lien. In the case of *Alexander et al.* vs. *Ghiselin et al.*, 5 *Gill, at page* 182, the Court of Appeals repeat what had been repeatedly said before, "that courts of equity have properly required that every agreement shall be clearly and explicitly established before they will lend their aid to enforce it."

The agreement in this case, if it can be made out at all, must be found in the correspondence between Schley and Dall, which commenced on the 13th of December, 1844, and terminated on the 13th of December, 1845; and having read that correspondence with great attention, I do not find in it that clear and explicit evidence of a contract for a mortgage, which a court of equity should, in my opinion, set up, to the prejudice of creditors or purchasers. The first letter in the correspondence, is from Mr. Schley to Mr. Dall, under date of the 13th of December, 1844, in which the latter is informed, that the parties interested in the fund then paid in, and thereafter to be received, are anxious that the writer should become trustee for the purpose of investing it, and that he had consented to do so upon certain conditions; and further informing him, (Dall,) that if the arrangement was made, he (Dall) might count on a loan of $30,000, to be secured as therein mentioned, for five years at least, or perhaps for fifteen, if desired. The arrangement proposed by this letter not having been perfected, and having been subsequently abandoned, it cannot, in my judgment, have any material influence upon the decision of the cause.

The next is from Dall to Schley, dated the 22d of the same

month and year, in which, after making some objection to giving personal security in addition to the mortgage, he says, if required to mortgage his whole landed estate, he will confine himself to 15 or $16,000.

The succeeding letter is also from Dall to Schley, dated the 7th of February, 1845, in which, after speaking of some private pecuniary transactions between them, he uses language from which it may be inferred, that the negotiation in regard to the loan had failed, or was likely to fail. On the 24th of the same month and year, Dall again wrote Schley. In this, he makes first a statement of a transaction he had with Mr. Stonebraker, to whom he had given a mortgage, and then referring to an acceptance which Schley was under for him for $6000, to become due on the 27th, he expresses a wish that Schley would pay it out of the money he was to get from the trust estate, and then adds—"this draft and $6000 I owe Mr. Albert, makes $12,000 I expect to get from this source. If, however, I cannot succeed through you in getting it, I would then prefer you not to pay my draft for $6000. But, if that loan can be effected, I will then give you a mortgage on 772 acres of land for the $12,000, and be quite easy hereafter. If this, however, cannot be done, I will retire the $6000 draft and make such arrangements as I can to meet my engagements here. Your paying this draft on the 27th instant, I shall view as an accomplishment of my wishes without putting you to the trouble of writing expressly for that purpose, and so soon as notified, will hold myself ready to forward the mortgage as above."

The next letter is also from Dall to Schley, dated the 2d of April, 1845, in which he says—"In relation to McKim's affairs, it is entirely beyond my desire to embarrass your movements, and do not feel any uneasiness about the responsibility. I am not at all anxious to cancel the bond, provided I get the money agreed upon; so that if you can compass my draft for $6000 in thirty days, and can provide for Albert's judgment when due, at the furthest, say in December, it will answer my purpose, and probably suit you as well, so that you can do as you please." From this letter it is quite obvious, that Schley

had not paid the draft for $6000 at its maturity, or even at the date of the letter, and that difficulties, the nature of which the correspondence does not explain, had arisen, from which it was supposed Dall might be uneasy on account of his responsibility as surety in Schley's bond as trustee.

Then follows a letter from Dall to Schley, dated the 23d of May, 1845, in which he acknowledges the receipt of three letters from Schley to him, the last dated the 22d instant, (which letters, however, are not filed.)

In this letter, Mr. Dall states, "that in this last letter from Schley he received his check for $6000, which he should send to Baltimore for collection. He then proceeds as follows : "In your letter enclosing this check, you observe, that you are endeavoring to get the parties interested to consent to the extension of the loan for five years, and think they will so agree. I sincerely hope you will be able to succeed in this effort, for as I have always considered this loan as a permanent one, I fear it would be inconvenient to return the money so soon." In relation to the remainder for Albert, I desire you so to arrange as will be most convenient to yourself. If Albert is paid his $6000 by the 5th of December ensuing, it is all he can ask for ; but if paid before, I suppose it will be more agreeable to him. So soon as you can arrange this latter, I shall be ready to execute the mortgage as agreed upon."

This letter shows, conclusively, that no certain definite contract had then been made. The time for which the money was to be loaned had not been agreed upon, but was a subject of negotiation between Schley and the parties interested.

The next letter, bearing date the 2d of September, 1845, is from Schley to Dall : in it he expresses his desire to close the transaction in relation to the loan of $12,000, so as to make that sum due him from the first of July of that year, and he suggests how the calculation shall be made for that purpose, and asks to be informed how much is due to Mr. Albert, so that the difference to be paid by Dall, in satisfaction of Albert's judgment may be ascertained ; and then specifies, particularly, the terms and conditions upon which this loan is to be made.

In the reply of Mr. Dall to this letter, under date the 9th of the same month and year, he furnishes the calculations suggested by Mr. Schley, showing that, calculating interest to the 20th of the month, there would be required from the writer, the sum of $66 29 to pay the judgment of Albert, the balance to be furnished by Schley ; and, that when the judgment should be so paid, there would be due from Dall to Schley, as of the 1st of July, 1845, the precise sum of $12,000. He also states in this letter, that he has no objection to the provisions of the mortgage mentioned by Schley, though he does object to the introduction of some other provisions.

The next letter is from Schley to Dall, dated the 23d of October, 1845, in which he says—"I go to Annapolis to-morrow, and shall return on the then ensuing Saturday, &c. As soon as I return I will pay Mr. Albert the amount of his judgment, and will forward you his receipt, so that you may have it entered satisfied. If he approves the deed, I will forward that also, and you will please have it recorded, and send me by mail a certified copy under the clerk's seal of office, so that I may file it in chancery. At the same time, I shall need his certificate that there *are no liens* on the property covered by the deed of trust."

The next letter in the series, is from Dall to Schley, dated the 27th of October, 1845, in which he acknowledges the receipt of Schley's letter to him of the 23d, and another letter written from Annapolis. (This letter is not filed.) I do not deem it necessary to make long quotations from this last letter from Dall, but the conclusion is clear, from a perusal of it, that Schley, in his letter from Annapolis, had made propositions which Dall would not accede to, and that these propositions were made at the instance, and upon the suggestion, of the parties beneficially interested in the money.

This letter from Dall, after explaining the situation of the writer's landed property, proceeds to say—"I hope this will satisfy your friends, and show that you have stated nothing but what is fully carried out in the mortgage. You must not be exorbitant in your demands of security, and I cannot give any

24

more. Indeed I would prefer to cancel the whole matter than give another cent's security. It is enough in all conscience, and I can give no more than I have already. The terms shall be adhered to by me, so far as possible, and I, at present, see nothing to make me doubt of a strict compliance on my part. Should you think proper to confide the papers to my care, to have them recorded, I will send you the necessary certificate of the clerk. In the meantime, I hope you will send me Mr. Albert's receipt that all is right, for I prefer that, and the recording of the mortgage, should go together at least."

That the contract was not complete when this letter was written, is very apparent. Terms had been proposed with which Mr. Dall would not comply, preferring even the cancellation of the entire arrangement.

The last letter is dated the 13th of December, 1845, and is from Schley to Dall. In it, he acknowledges the receipt of a letter from Dall to him, which is not filed, but in which it is manifest from the letter of Schley, Mr. Dall proposed to see him in person, and then after some matters which are not deemed material, he says, "If the object of your visit is to have the whole arrangement cancelled, I shall be very willing to accede to such a course, being heartily desirous to resign the appointment, and which the Chancellor has informally told me he would accept. As soon as I had closed the loan to you, I intended to apply to him to be released. The bond you executed to me and the mortgage are still in my possession, and if the arrangement is cancelled, I am prepared to surrender them to you."

The statement of facts which has been already referred to, shows that the mortgage was on or about the 1st of January, 1846, returned by Schley to Dall, and by the latter destroyed. Now, taking all this correspondence into view, coupled with the fact of the actual surrender to and cancellation of the mortgage by the mortgagor, and I cannot well understand upon what ground it can be contended, that the complainants have succeeded in showing a consummate and binding agreement for a mortgage, which shall be enforced as against creditors and purchasers.

It seems to me very clear, that the terms had never been complied with by Schley, upon which the mortgage was to be registered, nor could they be complied with, without first paying the judgment to Albert, because until it was paid, the certificate which Mr. Schley said he should require that there were no liens on the property, could not be procured.

But, even if there ever was a period in the whole course of this negotiation when the contract could be considered so far perfect as would have justified the placing the mortgage upon record, it is evident that for some cause or other, it was afterwards abandoned, and the mortgage given up to be cancelled, and that it was cancelled accordingly.

If it be said that Schley, the trustee, had no right to surrender the mortgage after he had actually loaned Dall $6000, of the trust fund, the answer is, that if he was guilty of a breach of trust in so doing, his bond was responsible for it, and although the parties to the bond may not be good, that is no reason why the consequences of a violation of his duty as trustee, should be thrown upon innocent third persons who had nothing to do with taking it, and who had no right, at any time, to object to its sufficiency as the *cestui que trusts* had.

It would, as it seems to me, be extremely difficult to maintain even as against Dall, the specific execution of this contract for a mortgage. In the first place, there is nothing upon the face of this record to show the precise terms and conditions, contained in it; but even if these could be made out, how could the creditor call for the execution of a contract for a mortgage, when after it was executed and placed in his hands he had voluntarily surrendered it to the mortgagor to be cancelled, and he had cancelled it. That the mortgagee was acting in a fiduciary capacity can make no difference, because, for any violation of his duty as trustee, the remedy of the parties injured was upon his bond.

But, if there would be difficulty in enforcing this alleged contract as against Dall, surely the difficulties are increased when an attempt is made to enforce it against his creditors, and more especially against purchasers for value. To enforce it

against purchasers would be pushing the case of *Alexander* vs. *Ghiselin* further than is required by any principle clearly decided by it, and with respect to Dall himself, the whole reasoning of the court shows that it would not be enforced, unless a valid subsisting agreement, definite in all its parts, and explicitly proved, was made out.

As far as the cases have gone in Maryland, it is of course proper for the security of the rights of property, and to avoid confusion and uncertainty, that this court should continue to enforce those equitable contracts for mortgages as against creditors : but I should very much doubt the policy of carrying the doctrine further than it has already been pressed. Grave doubts have been expressed by eminent judges, whether the doctrine of postponing registered, to unregistered conveyances, upon the ground of notice, should have been introduced ; and though it is now too well established to be unsettled by the courts, it has been so qualified, as only to apply to cases where the notice is so clearly proved as to make it fraudulent in the purchaser to take and register a conveyance in prejudice to the known title of the other. 1 *Story, Eq., section,* 398 ; *Wyatt* vs. *Boswell,* 19 *Vez.,* 439. And if a party who holds a prior unregistered conveyance can only prevail, as against a junior registered conveyance, upon such clear proof of notice on the part of the latter, as to make it fraudulent in him to take his conveyance, it would seem to inculcate the doctrine, that the courts should be cautious how they give expansion to the cases in which secret equitable contracts for liens have been set up, as against innocent third parties. The cases in which these secret equities have been set up, were all cases between the party holding the lien and creditors. That was the case of *Alexander* vs. *Ghiselin,* and it is believed no case can be found in which the secret equitable lien has been maintained against a purchaser ; and, with my opinion in reference to the dangerous consequences of the doctrine, I am not disposed to make a precedent of the kind. It would be placing the holder of such secret equitable lien in a better situation than a party who has taken his conveyance, but has omitted to record it.

It has been said in this case, that the defendant, McAttee, had notice in fact of the existence of this alleged lien, or if he had not notice in fact, he had sufficient information to put him on inquiry, and in either case is bound by it. But that he had not notice in fact, is, I think, very plain. Nor had he such notice as was even required to put him on inquiry. There can, from the very nature of the case, be no fixed or general rule upon this subject, and each case, therefore, must depend upon its own circumstances. The cases and the doctrine upon the subject are collected and commented upon by Mr. Justice Story, in the first volume of his *Commentaries on Equity, section* 400, and will be found, I think, not to embrace that now before this court.

The sale to McAttee took place on the 11th of November, 1847, and he admits, in his answer, that about the time of the sale, he heard that Dall was the surety of Schley, and was likely to have to answer for many of his debts. This admission and the statement by the crier who made the sale, that the property was sold subject to all prior claims and judgments, it is supposed fixes McAttee with notice. Such, however, is not my opinion. Suppose Mr. McAttee upon receiving this information had addressed himself either to Schley or Dall, what would they have told him? Certainly not that there was, then, an existing equitable contract for a mortgage. On the contrary, they would have told him that as far back as January, 1846, the mortgage which had been executed, had been given up and cancelled by agreement between them.

I am, therefore, of opinion, under all the circumstances of this case, that the relief prayed by this bill against McAttee, cannot be granted, and I shall, therefore, dismiss it, as to him, though as the complainant Gill instituted this suit in the proper and judicious discharge of his duty as trustee, I shall not subject him to cost.

RICHARD W. GILL and NICHOLAS HAMMOND for Complainants.

WM. B. CLARKE and THOMAS G. PRATT for the defendant McAttee.